LUKENS, INC., formerly LUKENS STEEL COMPANY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lukens, Inc. v. Commissioner
Docket Nos. 9660-82; 26903-82.
United States Tax Court
T.C. Memo 1987-464; 1987 Tax Ct. Memo LEXIS 460; 54 T.C.M. (CCH) 517; T.C.M. (RIA) 87464; September 15, 1987. *460 In 1976 and 1978, petitioner put into service at its steel mill certain electric overhead travelling cranes and supporting structures. The structures are sheeted on the top by metal roofing and on the sides and ends by fiberglass siding. Held; the crane structures including the roofing and siding are not buildings or structural components thereof but are items of equipment used by petitioner as an integral part of manufacturing and qualify for ITC and double declining balance depreciation. Held further; certain ancillary structures are buildings or structural components thereof and do not qualify for ITC and double declining balance depreciation. Kimber E. Vought, J. Allen Dougherty and Richard D. Birns, for the petitioner. Joellyn Cattell, for the respondent. SHIELDS
MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: Respondent determined deficiencies in petitioner's Federal income tax as follows: Taxable Year [1] *461 Deficiency
1976
$ 316,091.00
1977
1,425,957.00
1978
720,754.00
1979
265,829.00 After a number of concessions, the issues for decision are whether certain structures qualify in whole or part for (1) investment tax credit under section 38, [2] and (2) 200 percent declining balance depreciation under section 167(b)(2). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations and exhibits associated therewith are incorporated herein by reference. Petitioner, a Pennsylvania corporation, engaged primarily in the manufacture of high quality carbon steel and steel alloy plates, had its principal place of business at Coatesville, Pennsylvania, during the taxable years 1976 through 1979 and when its petitions were filed. Petitioner erected, or substantially rebuilt, put into service, and used at its steel mill certain structures, which are referred to by the parties, and *462 hereinafter, as the Ingot Conditioning Area ("ICA"), the Batch Heat Treatment Area ("BHT"), and the 206 Inch Mill Finishing Area ("MFA"). The ICA is an entirely new structure which was completed in 1976. The BHT is an extension, also completed in 1976, of an older structure. The MFA consists of three contiguous parallel structures which were reconstructed or rehabilitated in 1978 in order to provide additional capacity for heavier cranes, to provide clearance for the higher cranes, and to replace deteriorated parts. Each structure was specially designed for use in a particular process in petitioner's production of steel and steel plates. Since each such process included steps or functions in which the use of an electric overhead traveling crane (EOT crane) is required for handling the material being processed, each of the structures contained at least one such crane with a heavy lifting capacity (100 tons in the ICA, 75 tons in the BHT, and 85 tons in the MFA). [3]
All of the structures [4] are covered on the top by corrugated metal roofing and where exposed on the ends and sides [5] *464 by fiberglass *463 sheeting. The ends of each structure have wide triple-truck metal doors which roll up to permit trucks and other vehicles to freely pass in, through and out of the structure. All of the structures have dirt or gravel floors and roof ventilators but no heating, insulation, or air conditioning. They also have no interior supports for their roofs or for the EOT cranes because such supports would interfere with the operation of the cranes. In other words the cranes as well as the roof of the structures are supported entirely by the sides and ends of the structures. The ICA is a typical modern steel mill structure which is 108 feet wide, 280 feet long and 53 feet and 10.5 inches high at the eaves. The structure was designed to support two EOT cranes with 100 ton capacities but as of the date of trial only one such crane had been installed. The extension of the BHT involved herein is also a typical modern steel mill structure which is 104 feet wide and 569 feet long. The structure was designed to support three 75 ton capacity EOT cranes. The MFA reconstruction and rehabilitation program of 1978 involved three parallel structures known as the Cooling Bay, Sand Bay, and Gas Cutting Bay. Each bay is approximately 100 feet wide and 600 feet long. The MFA program of 1978 was undertaken in order to increase the capacities of the EOT cranes located in the three bays. To accomplish this all three structures were substantially altered and changed, or in the case of the cooling bay, torn down and completely rebuilt. During the program EOT cranes with the following capacities were installed: an 85 ton and a 20 ton in the cooling bay, a 60 ton in the sand bay, *465 and a 60 ton, a 50 ton and a 20 ton in the gas cutting bay. With respect to each bay, the work consisted of the following:
Cooling Bay
(a) Dismantle of the existing structure; (b) Construction of new and additional foundations between the existing foundations; (c) Construction of new step columns on the new foundations; (d) Construction of a new crane runway 10 feet higher than the old runway and of the heavier capacity; (e) Construction of a new roof, including new trusses and bottom braces, 16 feet higher than the old roof.
Sand Bay
(a) Construction of new and additional foundations between the existing foundations; (b) Construction of new step columns on the new foundations with longitudinal trusses for supporting the existing roof; (c) Dismantle of the existing columns and crane runway; (d) Construction of a new crane runway.
Gas Cutting Bay
(a) Replacement of 14 crane runway girders; (b) Repairing and reinforcing existing columns and runway girders; (c) Replacing 20 existing columns with 9 new columns; (d) Extending columns upward to provide additional crane clearance.
In each bay the program also included other miscellaneous work such as the construction of electric wire towers, *466 stairs, platforms, and barriers. Each of the five structures under consideration (one for ICA, one for BHT, and three for MFA) can be generally envisioned as a large empty rectangular box [6] in which is mounted at least one EOT crane. [7] An EOT crane basically consists of (1) two steel rails (known as craneway girders) [8] one of which rests at an appropriate height in the step of a row of steel columns along each side of the structure, (2) a steel bridge which spans the structure and the ends of which are mounted by steel wheels [9] on the craneway girders in such a manner that the bridge can be moved back and forth for the entire length of the structure, and (3) a steel trolley mounted on steel wheels upon the bridge in such a manner that the trolley and an attached two ton magnetic crane hook can be moved back and forth across the bridge for the entire width of the structure. Since the bridge of the crane can move back and forth for the length of the structure and the trolley can move back and forth across the span of the bridge for the width of the structure, the crane hook attached to the trolley is able to reach and move any object within the capacity of the crane from any point in *467 the structure to any other point within the structure. The entire crane, including the bridge, the trolley, and the crane hook, is remotely controlled by a box of switches strapped to the waist of an operator who walks about the floor of the structure in which the crane is located. With the switches the operator is able to move the bridge back and forth on the craneway girders, the trolley back and forth across the bridge, and the crane hook up and down beneath the trolley. The stepped steel columns along the sides of each structure which support the craneway girders rest *468 upon concrete foundations. The stepped columns are tied together at the top with a system of steel trusses as well as with chord bracing at the bottom of the trusses. When one of petitioner's EOT cranes is in operation, it exerts both vertical and horizontal forces upon the crane's craneway girders. The amount of such forces is dependent upon the weight of the crane and its load. The vertical forces are absorbed by the stepped columns along the sides of the structure and their foundations. The horizontal forces are absorbed for the most part by the structure's system of steel roof trusses and bottom chord bracing and to a small extent by the roofing and sheeting because in the absence of the roofing and sheeting more trusses and bracing would be required. Dynamic moving loads are also imposed upon the entire structure by the starting and stopping of the loaded crane. The repetition of these loads tends to cause metal fatigue in many components of the structure. Consequently, any EOT craneway structure is designed to spread to the extent possible these stresses over the entire structure. The design must also take into consideration the number and capacity of the EOT cranes to be *469 used in the structure. The craneway structures at ICA, BHT, and MFA are comparable in many ways to the craneway structures in a typical basic oxygen furnace ("BOF") which is a facility used to make steel by injecting molten iron and scrap with oxygen. A BOF facility typically consists of a single structure containing a center aisle of oxygen furnaces flanked by two heavy EOT craneways. The furnaces, used for melting iron ore and scrap and injecting the molten mass with oxygen, are independently supported by massive concrete foundations. The flanking craneways, one of which is used to lift and move ladles full of the molten iron and scrap and the other to lift and move ladles full of molten steel, are supported by structures with components similar to those found in the craneway structures at ICA, BHT, and MFA including crane girders, stepped columns, concrete column foundations, overhead bracing, and even some roofing and siding. The only substantial difference in the components stems from the capacities of the cranes since the cranes at a BOF are required to lift loads of 300 to 450 tons while petitioner's cranes have maximum capacities of only 75 to 100 tons. Consequently the *470 components of the craneway structures in a BOF are required to be correspondingly heavier. In appearance the craneways are generally the same except that those in BOF are taller and more narrow than petitioner's craneways. A schematic drawing of a cross section to a covered EOT crane structure which is similar to those of petitioner in ICA, BHT and MFA is set forth on page 12. TYPICAL EOT CRANE AND SUPPORTING CRANEWAY STRUCTURE.
[SEE ILLUSTRATION IN ORIGINAL] The metal roofing on the top and the sheeting on the sides of each structure are attached to the trusses and the stepped columns by steel girts or purlins. The principal purpose of the roofing and the sheeting on the ICA, BHT and MFA structures is to provide shelter for the production process taking place within the structures since in their absence the interior of the structures and any process occurring therein would be subject to rain, snow and any other element of the environment. In the conditioning process conducted in ICA and the finishing process conducted in ICA and the finishing process conducted in BHT and MFA, it is important to keep the hot steel ingots and steel plates relatively dry because if moisture comes into *471 contact with hot alloy steel it can cause cracks and other defects in the metal. Roofing and sheeting, however, are not essential to all crane structures as illustrated by petitioner's craneway structure known as the South Steelyard (SSY) where ingots are conditioned which do not require grinding or any other processing in a heated condition. The craneway structure at SSY which is not at issue, has no roof or sheeting and is entirely open to the outside environment. In spite of the roof and sheeting the interior of each of petitioner's covered crane structures is generally open to the outdoor environment because of the repeated opening and closing of the large doorways in the ends of the structure, the open ventilators in the roof, and the absence of heating, insulation and air conditioning and also because of the huge size of each enclosure. Furthermore, while the roofing serves to keep heavy rain and snow from directly penetrating the enclosure, it is impossible to keep the roof from leaking due to the stress exerted on the entire structure by the operation of the crane. The general nature of the environment in the interior of the craneway structures is illustrated by the fact *472 that in the winter employees working within them wear insulated undergarments and down vests, leaks from the roof frequently cause puddles to form on the floor which freeze at times during the winter, and birds roost in the overhead chord and braces. The crane structures contain no offices or restrooms but attached to the outside of ICA are a swarf room, [10] heated and air conditioned lean-tos containing a lunchroom, lockers and restrooms, as well as an area for doing paperwork. ICA and BHT also have certain other outside ancillary structures in the nature of lean-tos for preheaters and furnaces. At its Coatesville facility petitioner does not manufacture raw steel from iron ore. Instead it manufactures carbon steel and alloy steel from scrap steel and other raw materials such as alloying agents and then processes such steel into finished plates. Petitioner's process of manufacture at Coatesville begins in a melt shop, where in electric arc furnaces, scrap steel is melted, purified, and when necessary mixed with alloying agents to produce the carbon or alloy steel desired for a particular application. *473 Turning the molten steel into finished plates requires, in broad outline, four additional steps. These are (a) casting the molten steel into ingots; (b) conditioning the steel in the ingots; (c) rolling the conditioned ingots into plates; and (d) finishing the plates. An ingot is cast or made in the melt shop by pouring molten steel into a mold, permitting the molten steel to solidify by cooling and then removing the mold. Depending upon the size of the mold, an ingot can be 72 to 144 inches long, 54 to 110 inches wide, and 23 to 40 inches thick and will weigh approximately 12 to 75 tons or about 24,000 to 150,000 pounds. During the casting of an ingot, impurities remaining in the molten steel tend to rise into the smaller portion at the top of the ingot which is known as the "hot top." In addition, defects such as stress cracks tend to form near the surface of the ingot. Before the ingot can be rolled into plates, it must be conditioned by the removal of any impurities or defects. Impurities are usually removed by simply cutting the hot top off with a torch and returning the top to the melt shop for reuse as scrap. Any surface defect is removed by grinding. In the case of alloy *474 steels, most of the conditioning must be done while the steel is hot. Once the ingot has been conditioned it is transferred to a rolling mill where it is heated to a temperature of approximately 2,300 degrees Fahrenheit and rolled into plates of the width and gauge specified by the customer. After the steel has been rolled into plates it must be finished, which consists of (a) cooling the hot plates in a manner appropriate for the particular application; (b) removing the rough edges of the plates to make a regular rectangular shape of the required size; (c) heat-treating the plates when appropriate for a specific application; (d) removing any imperfection from the surface of the plates through grinding; and (e) testing the plates for quality. In petitioner's manufacturing process, all ingots which require conditioning by grinding or which must be conditioned while hot flow from the melt shop to ICA which was specifically designed and constructed to provide conditioning of heavy alloy steel ingots. The principal activity occurring in ICA is the conditioning of such ingots by the removal of hot tops and the grinding away of any imperfections. Each ingot processed in ICA, is moved, turned, *475 positioned or otherwise lifted an average of about 24 times by the EOT crane during the conditioning process. Normally, about 8 ingots are processed in an 8 hour shift, or about 24 ingots in each 24-hour period. The proper operation of the EOT crane is essential to the conditioning process conducted by petitioner in ICA, since in the absence of the crane the steel ingots could not be moved and the conditioning process would cease. Percentage-wise the structural elements or components of ICA which are necessary to support the loads imposed by the crane and permit it to perform its proper function are: 100 percent of the crane rails, craneway girders, back-up trusses, lateral plates, girder bottom flange bracing, top chord bracing, bottom chord bracing, sway frame system, longitudinal bracing, stepped column foundation piers and caissons; 94 percent of the stepped columns; 92 percent of the roof trusses; 84 percent of the eave struts; and 71 percent of the knee braces. Without these elements, the balance of the structure would collapse. Both BHT and MFA were designed and constructed to provide finishing for alloy steel plates which require heat treatment. Generally the activities *476 occurring in BHT and MFA are (a) the thermal heating or cooling of alloy steel plates to specified temperatures by grades in order to impart some mechanical property to the steel, and (b) the trimming of such plates to a specified size. In the finishing process carried out in BHT, each steel plate is lifted about 20 separate times by BHT's cranes. The proper operation of the cranes is essential to the finishing process conducted by petitioner in BHT because in the absence of the cranes the plates could not be handled and the finishing process would cease. Percentage-wise the structural elements or components of BHT which are necessary to support the loads imposed by its EOT cranes and permit them to perform their proper function are the same as those set forth hereinbefore with respect to ICA except for some minor and insignificant differences in BHT's framing and footings. Without these elements the balance of the structure would collapse. During the finishing process carried out in MFA each heavy alloy steel plate is lifted about 15 separate times by one of the EOT cranes located in MFA. Percentage-wise the structural elements or components of MFA which are necessary to support *477 the loads imposed by its EOT cranes and permit them to perform their proper functions are the same as those set forth hereinbefore with respect to ICA and BHT. Without these elements, the balance of the MFA structures would collapse. At trial each party introduced the written report and testimony of an expert witness with respect to the craneway structures of petitioner. The experts agree that the component parts of each structure [11] can be divided into three categories; i.e., structural steel frame, sheeting (including the roof), and foundation. They also generally agree that the parts within each category can also be classified as to whether they are necessary for the EOT crane to carry loads and fulfill its function in the manufacturing process or whether the parts are merely present in order to support the roofing and the sheeting. After carefully considering the respective backgrounds, experience and reasoning of the experts as set forth in their written reports and testimony, we have concluded that in this case greater reliance should be placed upon the opinions and conclusions of petitioner's expert primarily because of his *478 more than 25 years experience in designing, evaluating, and rehabilitating steel mill structures including craneway structures used in facilities similar to petitioner's steel mill. [12]
We, therefore, have given greater weight to his conclusions in making our findings set out hereinbefore with respect to the necessary to support the loads imposed by the EOT cranes and to the proper function of such cranes in petitioner's manufacturing process. To be more specific, we adopt the finding of petitioner's expert that with respect to ICA, the following table identifies each component part of the craneway structure, properly categorizes the part, and states the percentage of the cost of the part which is related to the crane's proper operation: CRANE
RELATED
ITEM
PERCENTAGE
I. STRUCTURAL STEEL FRAME
Crane rails
100
Crane girders and crane stops
100
Back-up trusses
[13] *479 110   Lateral plates and handrail
118
Girder bottom flange bracing
110
Stepped columns
94
Wind posts
68
Mail trusses
93
Intermediate trusses
89
Top chord bracing
552
Bottom chord bracing
132
Sway frame system
100
Eave struts
84
Knee braces
71
Longitudinal bracing
137
End framing
0
Swarf room
0
Office building
0
Crane access platform and
100
stairs
Gutters and safety rails
0
II. SHEETING
Roofing and siding
0
Purlis and ventilator
0
supports
Girts
0
Sag rods
0
Doors
0
Ventilators
0
III. FOUNDATIONS
Stepped column piers
100
Stepped column caissons
100
End framing piers and caissons
0
Grade beams
83
Swarf room foundations
0
Office fdtns. and floor slab
0
For the same reasons, we find that the same information with respect to the BHT structure is set forth in the following table: CRANE
RELATED
ITEM
PERCENTAGE
1. STRUCTURAL STEEL FRAME
Crane rails
100
Crane girders
100
Back-up trusses
100
Lateral plates and handrail
141
Girder bottom flange bracing
100
Stepped columns
89
Wind posts
0
Main trusses
81
Intermediate trusses
81
Top chord bracing
326
Bottom chord bracing
127
Sway frame system
100
Eave struts
0
Eave trusses
100
Knee braces
78
Longitudinal bracing
81
End framing
0
Furnace bldg. lean-to
0
Preheater lean-to
0
Railroad siding lean-to
0
Substation lean-to
100
Welfare lean-to
0
Crane access platforms
100
Stairs
100
Roof access ladders
0
Safety rails
0
Gutters
0
II. SHEETING
Roofing and siding
0
Purlins and ventilator supports
0
Girts
0
Sidewall struts & door
67
frames
Sag rods
0
Doors
0
Ventilators
0
III. FOUNDATIONS
Stepped column piers
100
Stepped column spread
95
footings
Retaining walls
100
Grade beams
100
Trace well retaining walls
100
Furnace building lean-to
0
foundations
Preheater lean-to foundations
0
Railroad siding lean-to fdtns.
0
Substation lean-to foundations
100
Welfare lean-to foundations
0
Stair foundations
100
*480 Similarly, we find that the MFA's foundations, stepped columns, craneway girders, and overhead chords and trusses, are substantially related to the proper operation of its cranes. The total cost of ICA was $ 3,926.507. On its tax return for 1976, petitioner classified $ 3,602,507 of the total cost as being incurred for the acquisition of tangible personal property or other tangible property used as an integral part of manufacturing that was not a building or structural component thereof and, therefore, qualified under section 38 for investment tax credit ("ITC") and for depreciation under section 167(b)(2) on the 200-percent declining balance method. On the 1976 return petitioner classified the balance of $ 324,000 of the total cost of ICA as being the cost of buildings or structural components thereof, which did not qualify for ITC and 200-percent declining balance depreciation. The total cost of BHT was $ 6,417,989. On its tax return for 1976, petitioner classified $ 6,011,989 of the total cost as being incurred for tangible personal property or other nonbuilding tangible property used in manufacturing which qualified for ITC and double declining balance depreciation. The balance *481 of $ 406,000 was classified by petitioner as the cost of buildings. Accordingly, on its returns for 1976 and 1979, petitioner claimed ITC and depreciation deductions in connection with ICA and BHT as follows: 1976
ITC
$   961,450
Depreciation deduction for tangible
personal property and other non-building
tangible property
663,016
Depreciation deduction for buildings
16,425
1977
Depreciation deduction for tangible
personal property and other non-building
tangible property
$ 1,234,678
Depreciation deduction for buildings
32,111
1978
Depreciation deduction for tangible
personal property and other non-building
tangible property
$ 1,102,731
Depreciation deduction for buildings
30,666
1979
Depreciation deduction for tangible
personal property and other non-building
tangible property
$ 1,017,244
Depreciation deduction for buildings
$    29,286
With respect to MFA, the total cost of reconstruction and rehabilitation was $ 8,299,279. On its tax return for 1978, petitioner classified $ 7,617,720 of the total cost as being incurred for tangible personal property or other non-building tangible property used in manufacturing which qualified for ITC and double declining balance depreciation. The remaining $ 681,559 was classified *482 as the cost of buildings. Accordingly, on its 1978 and 1979 tax returns, petitioner claimed ITC and depreciation deductions in connection with MFA as follows: 1978
ITC
$ 761,772
Depreciation deduction for tangible
personal property and other non-building
tangible property
525,318
Depreciation deduction for buildings
15,335
1979
Depreciation deduction for tangible
personal property and other non-building
tangible property
$ 978,255
Depreciation deduction for buildings
29,980
Respondent mailed two notices of deficiency to petitioner, one for the years 1976 and 1977 and the other for the years 1978 and 1979. With respect to ICA and BHT, respondent in both notices disallowed petitioner's claims for ITC and accelerated depreciation on the foundations and between 57 and 65 percent of the structural steel, siding, and roofing. With respect to MFA, respondent disallowed petitioner's claims for ITC and accelerated depreciation on all structural steel and all foundations, claiming that all of the MFA structures constituted buildings. Petitioner filed a separate petition for each notice. In the petition relating to 1976 and 1977 (docket No. 9660-82), petitioner timely claimed an overpayment for each year *483 due to misclassification of part of the ICA and BHT costs as buildings rather than other tangible property which qualified for ITC under section 38 and accelerated depreciation under section 167(b)(2). In the petition relating to 1978 and 1979 (docket No. 26903-82), petitioner timely claimed overpayments because (1) depreciation deductions with respect to the ICA and the BHT structures were understated in 1978 and 1979 due to the misclassification in 1976 of the costs of such structures and (2) ITC for 1978 and depreciation deductions for 1978 and 1979 were understated by the misclassification of the cost of MFA to the extent of $ 390,173 as buildings rather than other tangible property. OPINION From the record as a whole it is clear, and neither party contends to the contrary, that petitioner's craneway structures exclusive of the ancillary structures at ICA and BHT constitute real properties used by petitioner as an integral part of manufacturing. In fact in final analysis the parties are in agreement that such structures are other tangible property used as an integral part of manufacturing within the meaning of section 48(a)(1)(B)(i) and other tangible property used as an integral *484 part of manufacturing which is subject to depreciation under section 167 within the meaning of section 1245(a)(3)(B)(i). It follows, therefore, that the structures qualify for ITC under section 38 and for double declining balance depreciation under section 167(b)(2) provided such structures are not buildings or structural components of buildings. See sections 48(a)(1)(B), 167(b)(2), and 1245(a)(3). Petitioner contends that the craneway structures qualify for ITC and double declining balance depreciation because they constitute structures which are essentially an item of machinery or equipment. Respondent apparently concedes that the EOT cranes would qualify for ITC and double declining balance depreciation but contends that the craneway structures do not so qualify because they constitute buildings. Respondent's exact position is uncertain because in the deficiency notices he allowed ITC and double declining balance depreciation on the cranes and a substantial portion of the craneway structures at both ICA and BHT but disallowed both the credit and the depreciation with respect to any part of the structures at MCA. Nevertheless in his trial memorandum respondent states that "there *485 is no dispute that the crane and craneway structures are machinery." However respondent's post-trial briefs are devoted almost entirely to arguing that petitioner has failed to prove that its structures do not meet either the appearance test or the functional test used in many cases to determine whether or not a structure is a building. See generally Illinois Cereal Mills, Inc. v. Commissioner,789 F.2d 1234 (7th Cir. 1986), affg. a Memorandum Opinion of this Court; A. C. Monk & Co. v. United States,686 F.2d 1058 (4th Cir. 1982); Yellow Freight System, Inc. v. United States,538 F.2d 790 (8th Cir. 1976). For instance, respondent points out that even though petitioner concedes that in some respects the huge structures have the appearance of buildings inasmuch as they have roofs, walls, and constitute enclosures, petitioner has failed to establish the amount and nature of the work performed in each structure and the number of employees working there. The problem with respondent's approach is that it fails to recognize that petitioner's proof was presented in support of the theory that the structures were engineered, designed, constructured, and used by petitioner as large pieces of *486 equipment. Consequently the numerous cases cited by respondent as to whether or not a particular structure has the appearance and/or some of the functions of a building have little if any bearing. However, even if we concluded that such tests were applicable in this case, we would still have to find on the record as a whole that petitioner's craneway structures fail to pass the functional test for buildings because the principal and primary function of the craneway structures is to provide an essential factor, i.e., heavy lifting, in petitioner's manufacturing process. Thirup v. Commissioner,508 F.2d 915, 919 (9th Cir. 1974). In other words to paraphrase the vernacular adopted by us in Satrum v. Commissioner,62 T.C. 413, 417 (1974), the production work performed by the craneway structures is what the facility is all about and any other work performed within the structure by humans or by other equipment is merely supportive of or ancillary to the work provided with the craneway structures. We have found from the record before us that the craneway structures were designed and constructured for use by petitioner as an integral part of its manufacturing process. We have also found *487 that, with the exception of the ancillary structures at ICA and BHT, each component of the craneway structures was substantially required in order to support the EOT cranes and permit them to function properly. With respect to the sheeting, we have found that it was attached to and, therefore, was a component of the craneway structures and that its principal purpose was to protect the material being processed by use of the structures rather than to provide any working space, convenience, or protection for employees. However, the sheeting also helped to absorb the horizontal forces exerted upon the crane's craneway girders and thereby reduced the amount of trusses and bracing needed to support the EOT cranes and permit them to function properly. In fact all of the evidence in the record tends to establish beyond any question that each of petitioner's structures was engineered, designed, constructed and used as a large piece of equipment which served as the only practical manner of lifting, holding, moving and positioning the heavy steel ingots and plates involved in petitioner's manufacturing process. Both parties rely upon section 1.48-1(e)(1), Income Tax Regs., where the term "buildings" *488 is defined as follows: Buildings and structural components thereof do not qualify as section 38 property. The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing or to provide working, office, parking, display, or sales space. The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores. * * * Such term does not include (i) a structure which is essentially an item of machinery or equipment, or (ii) a structure which houses property used as an integral part of an activity specified in section 48(a)(1)(B)(i) if the use of the structure is so closely related to the use of the structure is so closely related to the use of such property that the structure clearly can be expected to be replaced when the property it initially houses is replaced. Factors which indicate that a structure is closely related to the use of the property it houses include the fact that the structure is specifically designed to provide for the stress and other demands of such *489 property and the fact that the structure could not be economically used for other purposes. Thus, the term "building" does not include such structures as oil and gas storage tanks, grain storage bins, silos, fractionating towers, blast furnaces, basic oxygen furnaces, coke ovens, brick kilns, and coal tipples. [Emphasis added]. Under the circumstances outlined hereinbefore we are convinced that petitioner's structures fall squarely within the exception for a structure which is essentially an item of machinery or equipment. In fact contrary to his position herein, and without citing or attempting in any manner to point out why it is not applicable, respondent has an outstanding revenue ruling which holds that a craneway structure almost identical to those in this case qualified for ITC because it was essentially part of the EOT crane it supported. See Rev. Rul. 79-183, 1979-1 C.B. 44 revoking Rev. Rul. 68-209, 1968-1 C.B. 16. Rev. Rul. 68-209 involved the following situation: The taxpayer is in the business of manufacturing pre-stressed concrete units for use in constructing buildings and highway bridges. A part of the process in the production of these units is carried out within *490 craneway structures erected and placed in service by the taxpayer after December 31, 1961. Each of these structures has a useful life of four years or more. The craneway structures have firmly attached roofs, open sides, dirt floors, and working heights of approximately 38 feet, and are equipped with overhead cranes and either fluorescent or incandescent lighting. The structures have sufficient working space to enable the construction of more than one pre-stressed concrete unit at a time. Under their dirt floors are tunnels containing high pressure steam pipes that provide steam for drying (curing) the completed pre-stressed concrete units. The overhead cranes can move lengthwise and widthwise on overhead tracks attached to the craneway structures and can be removed and replaced without replacing, retiring, or abandoning the structures. The firmly attached roofs of the structures serve a double purpose by (1) absorbing part of the stress that may be created by the movable overhead cranes when lifting or moving a heavy load, and (2) protecting the workers from the weather and thus permitting continuation of work during inclement weather.
Respondent first concluded in Rev. Rul. 68-209 *491 that the craneway structure described above was a building and thus did not qualify for ITC. However, in Rev. Rul. 79-183, 1979-1 C.B. 44, respondent revoked Rev. Rul. 68-209, and concluded that ITC was allowable with respect to the craneway structure because "the structure described in that ruling was so specially engineered, that it essentially served as part of the overhead crane with which it was associated." Furthermore, in Weirick v. Commissioner,62 T.C. 446 (1974), we determined that certain cable support and hold down towers used in the operation of a ski lift were section 38 property. The towers were placed at various points along the course of a ski lift and served to either support or anchor the lift cable. Because the towers were so closely related to other parts of the ski lift, which were in the nature of machinery, we held that the towers and other parts formed a unitary mechanism that was property in the nature of machinery. 62 T.C. at 454. Significantly, we found that the machinery parts of the ski lift could not function without the towers, as we have found in this case that the crane was useless without the supporting structure. In Valmont Industries, Inc. v. Commissioner,73 T.C. 1059 (1980), *492 we disallowed ITC for an enclosed structure on which an overhead craneway system was mounted; however, in that case the record contained no evidence concerning the relationship between the crane and the structure. For instance, it is unclear whether the structure was specifically designed to accommodate a particular crane or how much of the structure was necessary to support the crane. Finally, we agree with petitioner, and have so found, that in many ways petitioner's craneway structures are similar to the craneway structures found in a typical BOF except for insignificant differences in height and width and differences caused by the greater capacities required in BOF cranes. Consequently, we are unable to understand respondent's failure to adequately address this point or to attempt in any way to explain why petitioner's craneway structures should be treated differently from those found in a typical BOF when an entire BOF facility is used in section 1.48-1(e)(1) of the regulation as an example of the type of structure which is not to be considered a building. [14] *493 From all of the above, we conclude that in this case the craneway structures are essentially items of equipment and that each of their parts including the sheeting (roofing and siding) constitute components of such equipment and qualify for ITC and double declining balance depreciation. [15]Sections 38, 48(a)(1)(B)(i), 167(b)(2), and 1245(a)(3)(B)(i). Respondent has presented an alternative argument to the effect that if we find that the craneway structures are items of machinery or equipment, then ITC and double declining balance depreciation for a given component should be limited to the extent to which such component is related to the crane. Thus, for instance, 93 percent of the cost of the main trusses with respect to the ICA structure would qualify for such credit and double declining balance depreciation while the remaining 7 percent would not. Respondent's alternative argument is not persuasive, however, because *494 it relies upon our decision in Scott Paper Co. v. Commissioner,74 T.C. 137 (1980), which is clearly distinguishable. Scott Paper involved an electrical distribution system that provided power for the overall operation of a building as well as for certain machinery. There we held that the system qualified for ITC but only to the extent it supplied power for the machinery. 74 T.C. at 186-187. Thus, the electrical system was deemed to be partly machinery and partly a structural component of the building. In the present case, however, we have found that the crane structures are pieces of equipment and not buildings, therefore, the components are part of such equipment and not part of buildings. With respect to the ancillary structures at ICA and BHT, [16] *495 petitioner claimed very little ITC and 200 percent depreciation and at trial failed to produce sufficient proof to support such claims in excess of the amounts conceded by respondent. [17] Consequently, we find that petitioner is not entitled to ITC and double declining balance depreciation with respect to the costs associated with the ancillary structures to the extent contested by respondent. Decisions will be entered under Rule 155.
Footnotes
1. Prior to the periods involved herein petitioner had elected to use as its annual accounting period a taxable year ending on the last Saturday in December. As a result petitioner's taxable years 1976, 1977, 1978 and 1979 actually ended on December 25, 1976, December 31, 1977, December 30, 1978 and December 29, 1979. 2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, unless otherwise indicated. All rule references are to the Tax Court Rules of Practice and Procedure unless otherwise provided. ↩
3. Such capacities were needed in order to handle steel ingots and plates weighing up to 75 tons. ↩
4. The structures comply with Technical Report No. 13, Guide for the Design and Construction of Mill Buildings (1979) issued by the Association of Iron and Steel Engineers, which is a revision of Standard 13, Specification for the Design and Construction of Steel Mill Buildings (AISE) (1969). ↩
5. ICA, being a free-standing structure, has sheeting on both sides and both ends. Since BHT is an extension of an existing structure it has sheeting on both sides but only one end. Since the three MFA structures are contiguous and side by side the two outside ones (the Cooling Bay and the Gas Cutting Bay) each have sheeting on the ends and only one side while the center structure (the Sand Bay) has sheeting only on the ends. 6. Using ICA is an example, the empty box would be 108 feet wide, 280 feet long, and 53 feet, 10.5 inches high. ↩
7. At the time of trial one crane (100 ton) was mounted in ICA, two (75 ton and 20 ton) in BHT and six in MFA, two in the cooling bay (85 ton and 20 ton), one in sand bay (60 ton), and three in the gas cutting bay (60 ton, 50 ton and 20 ton). ↩
8. Where a structure contains more than one crane they are all mounted by separate trolleys or bridges on the same craneway girders. ↩
9. The wheels are similar to those found on railroad box cars except they are heavier and have a flange on both sides instead of only one. ↩
10. Where grindings are accumulated to be returned to the melt shop for use as a scrap. ↩
11. Exclusive of the ancillary structures at ICA. ↩
12. While the qualifications of respondent's expert are impressive they are limited almost entirely to the academic world. ↩
13. A percentage figure greater than 100 means that if it were not for one or more of the sheeting parts, more of the frame part would be necessary. 14. Respondent's comments are limited to an objection to petitioner's requested finding and a statement that there is no BOF at Lukens and that there are many differences between a BOF and petitioner's facilities. 15. The parties agree that to the extent the structures qualify for ITC under section 38 they also qualify for double declining balance depreciation under section 167(b)(2)↩. 16. The ancillary structures consist of the following: 1. Swarf room foundations and framing (ICA). 2. Office foundations and framing (ICA). 3. Welfare lean-to foundations and framing (BHT). 4. Preheater lean-to foundations and framing (BHT). 5. Furnace lean-to foundations and framing (BHT). 6. Railroad siding lean-to foundations and framing (BHT). ↩
17. Petitioner states in a footnote to a brief that the swarf room, preheater, and furnace lean-to "clearly are mere shelters for machinery" and as such qualify under our holding in Scott Paper Co. v. Commissioner,74 T.C. 137, 179-180 (1980). However, petitioner did not prove the relevant facts we relied on in Scott Paper↩ to find that the structures involved therein were mere shelters.