LUIS BARRENECHEA AND ESTATE OF LORENE BARRENECHEA, DECEASED, D. DEWAYNE CASEY, EXECUTOR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Barrenechea v. Commissioner
Docket No. 5911-88
United States Tax Court
T.C. Memo 1990-471; 1990 Tax Ct. Memo LEXIS 521; 60 T.C.M. (CCH) 638; T.C.M. (RIA) 90471; August 30, 1990, Filed *521 Decision will be entered under Rule 155. Donn Kemble, for the petitioners. Joyce M. Resnick and Frank R. Bailey, for the respondent. COHEN, Judge. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies of $ 95,867, $ 44,432, and $ 8,724 in petitioners' Federal income taxes for 1979, 1980, and 1983, respectively. After concessions, the issues remaining for decision are whether petitioners are entitled to investment tax credits on a steel manufacturing structure (craneway), a Cincinnati Press Brake, a chain link fence, a fire hydrant, a rail spur, and a slump block wall, and whether respondent's reallocation of income and expenses was appropriate. Respondent objects to the use of the term "craneway" as applied to the steel manufacturing structure in issue in this case. Our use of the term is for purposes of convenience, and no implication *523 is intended, by this usage, that the structure in issue is not a building for purposes of sections 48(a)(1) and 1245(a)(3). Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect for the years in issue. FINDINGS OF FACT Some of the facts have been stipulated, and the facts set forth in the stipulations are incorporated in our findings by this reference. Luis Barrenechea (petitioner) resided in Villa Park, California, when he filed the petition in this case. Background
Petitioner was employed in the metal fabrication business starting in 1950, first with Pascoe Steel Corporation (Pascoe), then with Amcord, Inc. (Amcord), and more recently with Bartec Industries, Inc. (Bartec). Pascoe was a large producer of metal building systems, specializing in the engineering, manufacturing, and erection of buildings for industry, hangars, craneways, schools, and service stations. While employed by Pascoe, petitioner held the positions of plant superintendent, production manager, vice president of manufacturing and construction, and executive vice president. Amcord was a diversified international manufacturing company listed *524 on the New York and Pacific Stock Exchanges. When Pascoe was acquired by Amcord, petitioner became a director and the president and chief operating officer of Amcord. During his 32 years of employment with Pascoe and Amcord, petitioner oversaw the manufacturing operations of the firms. During the years in issue, petitioner held a contractor's license issued by the State of California. Pascoe operated under petitioner's contractor's license. While petitioner was employed by Pascoe, Pascoe constructed approximately 600 craneways, including five craneways for its own use in plants in various parts of the United States. Petitioner oversaw the construction of approximately 20 craneways. Petitioner supervised the gathering of information needed to determine size, speed, height, and tonnage requirements. Petitioner would use this information to determine the best design for the particular craneway and bridge cranes under construction. Amcord was sold in 1979, and petitioner subsequently left its employ. In September 1981, petitioner purchased approximately 61.5 percent of the stock of Bartec, a company similarly engaged in metal fabrication and the erection of structural steel *525 for building-type structures. From 1981 through the years in issue, petitioner was actively employed as an officer of Bartec. Petitioner and his wife acquired the remaining stock of Bartec in September 1982. Whereas Pascoe had its own product lines, buildings, and structures, Bartec worked primarily on high-rise buildings from plans and specifications provided by architects and engineers. At the time petitioner acquired an interest in Bartec in 1981, he determined that Bartec needed a new facility. Bartec had only 2 years remaining on its lease, the lessor was contemplating tearing the structure down, and the structure was very old and small. Petitioner agreed to acquire, improve, and lease a new facility to Bartec. In late 1981 or early 1982, petitioner located property 12 miles from Bartec's existing facility. He purchased this property individually, because neither Bartec nor the owner of the minority interest in Bartec had cash to invest. Petitioner determined that Bartec could not continue in the steel fabricating business without a craneway. In March 1982, petitioner began to design and construct a craneway. Petitioner did not hire a general contractor; rather, he *526 oversaw the construction of the craneway himself. In February 1982, petitioner acquired approximately 4 acres of improved real property in Orange, California, that had been used as a lumberyard. Existing improvements on this property included an office building, a 6,000-square-foot block construction warehouse, parking lot, rail spur, fire hydrant, chain link fence, slump block wall, and landscaping. The total cost was $ 1,400,000. In March 1982, petitioner set up an office on this property and, along with a secretary and a construction coordinator, commenced construction of the craneway structure in issue. Petitioner designed the craneway; financed its construction; obtained government permits for construction and occupancy; contracted for a soil engineering investigation; contracted with Pascoe for the engineering of the structural components; contracted with Bartec for the purchase, delivery, and erection of steel; contracted with Pascoe for the purchase, delivery, and assembly of pre-engineered roof and side components; contracted for site grading; and contracted to increase substantially the size of the parking lot. Petitioner suervised several workers who performed a *527 variety of tasks to complete the craneway for occupation by Bartec, including moving the rail spur, moving the fire hydrant, digging footings, pouring concrete, and installing plumbing and an electrical distribution system. The structure in issue is the first craneway that petitioner built for himself. There was no substantial difference between the craneway designed and constructed by petitioner for Bartec and other craneways that had been designed and constructed for Pascoe. The total cost of the craneway was $ 561,418.70. Construction of the craneway was completed in September 1982. Four overhead bridge cranes, fabricated by Bartec at a cost of approximately $ 140,000, were installed in the craneway in or before September 1982. Appearance and Function
Petitioner's craneway resembled a large, empty rectangular box. The structure was approximately 525 feet long, 120 feet wide, and contained two 60-foot longitudinal girders, each supported by exterior columns and interior columns that ran the length of the rectangular structure. On top of the girders were rails similar to those on which trolley cars run. Standing on the longitudinal girders were bridge cranes, beams *528 that span two longitudinal girders and run on the girder rails. On top of the beams were trolleys to which hoists were mounted. The end result was a crane that traveled the length of the structure on the longitudinal girders and trolleys that traveled the width of the structure on the crane. Thus, there was crane access to any point within the craneway structure. The exterior and interior columns of the craneway structure rested on concrete footings. The structure was covered by a roof of corrugated metal panels. The floor of the structure consisted of approximately 32 percent concrete and approximately 68 percent dirt. The dirt floor was necessary to absorb hot pieces of metal that were thrown off by cutting torches. When the craneway was placed into service, the exterior side walls on the west end of the structure were open from floor level to 8 feet. The top 7 feet of the walls all around the structure were also open, except for the one enclosed end wall. The opening at the bottom was to allow ease of movement for workers to and from the structure. The opening at the top of the walls was to allow for ventilation of smoke from welding equipment. The far west bays were *529 completely open to allow for access by railroad cars and tractor trailers that were used to ship the finished products. Attached to the outer north side of the craneway was a small office with rest rooms and an eating area. The component parts of the craneway structure, including the columns, footings, roofing, and siding, were necessary to support the cranes. Because the craneway structure was covered with a roof, petitioner did not have to waterproof the motors or take other precautions to insure that the system did not rust. The siding was necessary to stabilize the columns and their concrete footings; otherwise the columns would have to have been substantially heavier. Although there were roof ventilators, petitioner did not install heating, insulation, or air conditioning. The environment inside the structure was equivalent to a shaded outside environment. The craneway was part of an operation that processed steel into specific dimensions with modifications for specific needs in building construction. The unprocessed steel beams, plates, etc., were unloaded by the overhead bridge cranes at one end of the craneway. The unprocessed steel beams, plates, etc., were processed *530 at different work areas depending on the design specifications and were removed to the construction sites when required. Depending on the work load, from 25 to 40 Bartec employees worked in the craneway processing the steel. All of the work done by Bartec's employees was performed under the craneway structure. The activities performed by Bartec's employees within the craneway included selecting the proper steel shapes, cutting the steel to the correct length, placing bolt holes of the correct size and pattern at the proper locations on the steel, adding weld plates and stiffening plates at the proper locations on the steel, and punching and painting the steel. Bartec's employees used the overhead bridge cranes, together with jib cranes and forklifts, to move and handle the steel. Bartec's employees used a variety of equipment within the craneway structure. Each of the four overhead bridge cranes owned by Bartec had a capacity of 7.5 tons and moved the steel around the work floor to and from different machinery and work spaces within the craneway. Each bridge crane spanned one-half the width of the craneway and was capable of rolling across the entire length of the craneway. *531 Crane hoists moved back and forth across the bridge cranes and were capable of lifting steel anywhere within each half of the craneway. In addition to the bridge cranes, there were eight smaller jib cranes, consisting of steel beams with hoists. These small cranes moved the steel around the work areas. Rental Income
Petitioner leased the property and the craneway to Bartec beginning in September 1982. The lease provided for a 27-month lease term commencing on September 20, 1982, and ending on December 19, 1984. The lease further provided for monthly payments of $ 10,800 commencing September 20, 1982, and specified that $ 2,100 of each monthly payment was attributable to office facilities and $ 8,800 of each monthly payment was attributable to equipment. (The discrepancy between these amounts and the total is not explained.) Petitioner allowed Bartec to occupy the premises rent free for 4 months, from September 1982 through January 1983. For the period January 20-31, 1983, Bartec paid rent of $ 4,260.84. For the remainder of 1983, Bartec paid rent of $ 10,800 per month. The realistic contemplation of the parties at the time of the lease was that the property would *532 be used by Bartec for an indefinite period. Subsequently, the lease was renewed, and Bartec continued to lease the premises until May or June 1988. Bartec ceased operations in 1989. In 1988, petitioner moved Bartec's business to another location. In July 1988, petitioner leased the property and craneway to a third party, Diversified Well Products (Diversified). Diversified wanted to use two of the four existing overhead cranes. At Diversified's request, petitioner paved additional floor space with concrete and, with the exception of an opening beneath the eaves, completely enclosed the craneway with siding. Petitioner spent between $ 60,000 and $ 70,000 to modify the craneway to meet Diversified's requirements. Petitioner and Diversified entered into a 5-year lease of the property and craneway. The lease provided for a monthly rental charge of approximately $ 20,000. Petitioner gave Diversified 3 months free rent at the beginning of the lease term. Petitioner purchased a Cincinnati Press Brake (CPB) for $ 196,000. Bartec needed the CPB but did not have sufficient funds to buy the press. The CPB was placed in service in 1983. There was no written lease between petitioner *533 and Bartec with respect to the CPB. Bartec paid petitioner monthly rent calculated at an hourly rate based on the number of hours each month that it used the CPB. If Bartec did not use the CPB during any month, it did not pay petitioner any rent. Tax Reporting
On Schedule E attached to his Federal income tax return for 1982, petitioner reported an unadjusted basis of $ 531,379 in the craneway for purposes of depreciation. This amount represented approximately 93 percent of the $ 561,418.70 expended to build the craneway. On their 1982 Federal income tax return, petitioners reported no gross income from rental of the craneway. Petitioners, however, disclosed that Bartec received free occupancy for 1982 by the following note on a schedule of Rent and Royalty Income: * Purchased facilities occupied by lessee as of the February 26, 1982 acquisition date. Additional assets constructed by taxpayer, completed as of August 13, 1982, and leased as of that date. Lease agreements provided that lessee initially received free occupancy as an incentive to lease the premises. (The discrepancy between this statement and the lease is not explained.) On their 1983 tax return, *534 petitioners reported gross income of $ 123,061 from the lease of the craneway. On Schedules E attached to their income tax returns, petitioners reported rent of $ 55,299 and $ 46,110 for 1983 and 1984, respectively, received from Bartec's use of the CPB. On their 1983 tax return, petitioners claimed an investment tax credit of $ 19,600 in connection with the CPB. On their 1982 tax return, petitioners claimed investment tax credits on other equipment associated with the craneway as follows: Equipment
Amount
Rail spur
$ 1,680
Fire hydrant
920
Chain link fence
870
Slump block wall
416
On their 1982 tax return, petitioners reported no outside service expense or insurance expense in connection with leasing the land and improvements to Bartec. On their 1983 tax return, petitioners deducted outside service expenses of $ 8,952 and insurance expense of $ 3,038. Petitioners computed net operating losses from operations in connection with leasing the land and improvements to Bartec in the amounts of $ 542,272 and $ 26,425 in 1982 and 1983, respectively. Petitioners elected to carry back the losses to 1979 and 1980. OPINION Petitioners bear the burden of *535 proof with respect to the issues in this case. Owen v. Commissioner, 881 F.2d 832 (9th Cir. 1989), affg. a Memorandum Opinion of this Court; Peck v. Commissioner, 752 F.2d 469, 473 (9th Cir. 1985); affg. a Memorandum Opinion of this Court; Hokanson v. Commissioner, 730 F.2d 1245, 1250 (9th Cir. 1984), affg. a Memorandum Opinion of this Court; Rockwell v. Commissioner, 512 F.2d 882, 885 (9th Cir. 1975), affg. a Memorandum Opinion of this Court; Rule 142(a), Tax Court Rules of Practice and Procedure.
Investment Tax Credit
The primary issue in this case is whether petitioners are entitled to an investment tax credit under section 38 with respect to the craneway. Resolution of this issue depends on whether the craneway is "section 38 property" and whether petitioner satisfies the rules applicable to noncorporate lessors. The noncorporate lessor rules also apply to the other items of property on which investment tax credit was claimed. Eligible Property
The term "section 38 property" is defined in section *536 48(a)(1), which provides, in relevant part: (1) In general. -- * * * the term "section 38 property" means -- (A) tangible personal property * * *, or (B) other tangible property (not including a building and its structural components) but only if such property -- (i) is used as an integral part of manufacturing, production, or extraction, or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, * * * * * * Such term incudes only * * * property with respect to which depreciation (or amortization in lieu of depreciation) is allowable and having a useful life (determined as of the time such property is placed in service) of 3 years or more. * * * Petitioners contend that the craneway in question qualifies as "other tangible property" used as an integral part of production under section 48(a)(1)(B). Respondent argues that the craneway is a building. For this purpose, "building" is defined in section 1.48-1(e)(1), Income Tax Regs., as follows: (e) Definition of building and structural components *537 . (1) Buildings and structural components thereof do not qualify as section 38 property. The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space. The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores. Such term includes any such structure constructed by, or for, a lessee even if such structure must be removed, or ownership of such structure reverts to the lessor, at the termination of the lease. Such term does not include (i) a structure which is essentially an item of machinery or equipment, or (ii) a structure which houses property used as an integral part of an activity specified in section 48(a)(1)(B)(i) if the use of the structure is so closely related to the use of such property that the structure clearly can be expected to be replaced when the property it initially houses *538 is replaced. Factors which indicate that a structure is closely related to the use of the property it houses include the fact that the structure is specifically designed to provide for the stress and other demands of such property and the fact that the structure could not be economically used for other purposes. Thus, the term "building" does not include such structures as oil and gas storage tanks, grain storage bins, silos, fractionating towers, blast furnaces, basic oxygen furnaces, coke ovens, brick kilns, and coal tipples. See generally Illinois Cereal Mills, Inc. v. Commissioner, 789 F.2d 1234 (7th Cir. 1986), affg. a Memorandum Opinion of this Court; Thirup v. Commissioner, 508 F.2d 915, 919 (9th Cir. 1974). Petitioner argues that "there is no substantial difference" between his craneway and the craneway designed and constructed by the taxpayer in Lukens, Inc. v. Commissioner, T.C. Memo. 1987-464, or the structure described in Rev. Rul. 79-183, 1979-1 C.B. 44, discussed in Lukens. Respondent argues that the issue of whether the craneway structures were buildings or machinery was effectively conceded *539 in Lukens. Despite respondent's apparent concession that the structures were not buildings, however, we did not decide the issue on that ground. Instead, we found that the craneway structures were designed and constructed for use by the taxpayer as an integral part of its manufacturing process as follows: In fact all of the evidence in the record tends to establish beyond any question that each of petitioner's structures was engineered, designed, constructed and used as a large piece of equipment which served as the only practical manner of lifting, holding, moving and positioning the heavy steel ingots and plates involved in petitioner's manufacturing process. * * * Under the circumstances outlined hereinbefore we are convinced that petitioner's structures fall squarely within the exception for a structure which is essentially an item of machinery or equipment. * * * [54 T.C.M. 517 at 526, 56 P-H Memo T.C. par. 87,464 at 87-2467.] Respondent does not point to any difference between the structure in this case and the one involved in Lukens. Citing Valmont Industries, Inc. v. Commissioner, 73 T.C. 1059 (1980), respondent argues *540 that Bartec's employees performed numerous activities at different work areas within the structure. As we stated in Lukens: In Valmont Industries, Inc. v. Commissioner, 73 T.C. 1059 (1980), we disallowed ITC for an enclosed structure on which an overhead craneway system was mounted; however, in that case the record contained no evidence concerning the relationship between the crane and the structure. For instance, it is unclear whether the structure was specifically designed to accommodate a particular crane or how much of the structure was necessary to support the crane. [54 T.C.M. 517 at 527, 56 P-H Memo T.C. par. 87,464 at 87-2468.] As in Lukens, the evidence in this case establishes that the purpose of the craneway was to move steel. Bartec could not fabricate steel without the craneway. The craneway was used as an integral part of Bartec's production, and the nature of the work performed by employees within the structure was ancillary or incidental to the function of the craneway. Respondent also argues that petitioner's craneway was not required to be replaced when the property initially "housed" by it was replaced. Respondent *541 points out that, because the craneway is now being used by a tenant other than Bartec, the structure could be used economically for other purposes. Petitioners, however, spent between $ 60,000 and $ 70,000 to modify the craneway to meet the requirements of the new tenant. The reasoning in Luken is persuasive, however, and we are persuaded that it should be applied to the indistinguishable facts in this case. Accordingly, we conclude that the craneway structure was essentially an item of equipment and not a building for income tax credit and depreciation purposes. Eligible Leases
Respondent argues that petitioners are not entitled to investment tax credit on the craneway or any of the other equipment because they have not satisfied the requirements of section 46(e)(3) relating to noncorporate lessors. (Respondent also argues that petitioners have not shown that the rail spur, fire hydrant, chain link fence, and slump block wall are used as a integral part of Bartec's manufacturing or production activities. See section 48(a)(1)(B), supra.) Section 46(e)(3) provides *542 in pertinent part: (3) Noncorporate lessors. -- A credit shall be allowed by section 38 to a person which is not a corporation with respect to property of which such person is the lessor only if -- (A) the property subject to the lease has been manufactured or produced by the lessor, or (B) the term of the lease (taking into account options to renew) is less than 50 percent of the useful life of the property, and for the period consisting of the first 12 months after the date on which the property is transferred to the lessee the sum of the deductions with respect to such property which are allowable to the lessor solely by reason of section 162 (other than rents and reimbursed amounts with respect to such property) exceeds 15 percent of the rental income produced by such property.
Section 46(e)(3)(A) allows an investment tax credit to noncorporate lessors for property manufactured or produced by the lessor. Regulations issued pursuant to section 46(e)(3)(A), however, permit the credit for property manufactured or produced by the lessor "in the ordinary course of his business." Section 1.46-4(d)(1)(i), Income Tax Regs. *543 , provides: (d) Noncorporate lessors. (1) In the case of a lease entered into after September 22, 1971, a credit is allowed under section 38 to a noncorporate lessor of property with respect to the leased property only if -- (i) Such property has been manufactured or produced by the lessor in the ordinary course of his business * * * Respondent contends that petitioner did not construct the craneway in the ordinary course of his business. Specifically, respondent argues that, although petitioner had supervised the construction of craneways as an officer of Pascoe, he had constructed no other craneways for himself. A taxpayer may be engaged in a trade or business even where the taxpayer rents or leases only one property or piece of equipment. Miller v. Commissioner, 85 T.C. 1064, 1074 (1985), and cases there cited. Petitioner was not a passive investor who merely financed acquisition of property for use in someone else's business. See Hokanson v. Commissioner, 730 F.2d at 1247. Considering all of the facts and circumstances in this case and the *544 purpose of section 46(e)(3), we conclude that petitioner manufactured the craneway in the ordinary course of his business. See Commissioner v. Groetzinger, 480 U.S. 23, 27 (1987). Compare Carlson v. Commissioner, 79 T.C. 215, 222-223 (1982), affd. 712 F.2d 1314 (9th Cir. 1983). Petitioner did not, however, manufacture or produce the CPB or the other equipment on which he claimed investment tax credits. As to those, we agree with respondent that petitioner has not satisfied his burden of proving that he complies with the noncorporate lessor rules. Petitioner's only argument with respect to the CPB is that he regarded the relationship between Bartec and himself as a "joint venture." His generalized assertion of the legal relationship, however, is not persuasive. On their tax returns, petitioners reported the money received from Bartec for the use of the press as rent received in the amounts of $ 55,299 and $ 46,110, respectively. To be entitled to the investment tax credit on leased property, petitioners must show that their realistic contemplation at the time the property was placed in service was that it would be used by Bartec *545 for less than 50 percent of its useful life. Petitioners have not persuaded us that the relationship between petitioner and Bartec with respect to the CPB or the other property was not a lease with an indefinite term. (Similarly, if the craneway had not been constructed by petitioner, we would conclude that the lease was for an indefinite term.) See Hokanson v. Commissioner, 730 F.2d at 1249-1250; Borchers v. Commissioner, 95 T.C. (July 19, 1990); Perry v. Commissioner, T.C. Memo. 1987-447, affd. 855 F.2d 859 (8th Cir. 1988); Conway v. Commissioner, T.C. Memo. 1982-358. Petitioners, therefore, are not entitled to any investment tax credit on these pieces of property. Rental Income and Expenses
The lease between petitioner and Bartec called for rental at the rate of $ 10,800 per month commencing September 20, 1982. Petitioner did not enforce the terms of the lease and, instead, dd not charge rent for the first 4 months of the lease term. Thus petitioners did not report any rental income in 1982 or for the first several weeks of 1983. Under the authority of section 482, respondent allocated to *546 petitioners 4 months of rent for 1982, totaling $ 43,200, and also increased petitioners' income for 1983 by $ 6,539. In Cooper v. Commissioner, 64 T.C. 576, 579-580 (1975), we held that section 482 authorizes the Commissioner to attribute income to sole shareholders of a corporation who allow the corporation to use assets of the shareholders in the business of the corporation. Petitioners must persuade us that the Commissioner's allocation is erroneous and the allocation must be sustained unless it is unreasonable, arbitrary, or capricious. See Peck v. Commissioner, 752 F.2d 469, 473 (9th Cir. 1985), affg. a Memorandum Opinion of this Court. Petitioner asserts that his agreement with the corporation was "fair and at arm's length" and cites the free period of occupancy in the Diversified lease executed 6 years later as evidence in support of his contention. Petitioner then argues that respondent has failed to prove that the rental charge was not fair rental value. We are not persuaded by petitioner's unsupported assertions, particularly in view of *547 the inconsistency between his present claim and the terms of the lease. The lease with Diversified was not made under the same circumstances and is not comparable. A period of free rent may well be common as an inducement to secure a tenant for an otherwise vacant property. Even if true, that is not comparable to a lessor constructing a facility for a particular tenant and allowing free occupancy at the commencement of the lease. Evidence supporting petitioners' position, if it were correct, should have been readily available, and it was petitioners' burden to produce it. In the absence of such evidence, respondent's determination is sustained. With respect to outside service and insurance expense, petitioner merely asserts that the tax returns as filed were correct. Neither the tax returns nor petitioners' unsupported assertions are evidence satisfying their burden of proof. See Geiger v. Commissioner, 440 F.2d 688 (9th Cir. 1971), affg. a Memorandum Opinion of this Court. The only evidence in the record shows that payments were made in 1982 and 1983 and that they were deducted in 1983. Petitioner argues that respondent's motive was related to disallowance *548 of the investment tax credits under the 15-percent rule applicable to noncorporate lessors, quoted above. Petitioner, however, has given us no reason to reject respondent's reallocation, and respondent's determination in this regard must therefore be sustained. As a result of respondent's disallowance of the investment tax credit, other adjustments were made by respondent to petitioner's depreciation expense and net operating loss deductions. Those adjustments must be revised to be consistent with our opinion on the investment tax credit issues. Otherwise the adjustments made by respondent have been conceded or abandoned by petitioners' failure to present evidence or to set forth arguments concerning them in their briefs. Decision will be entered under Rule 155.